IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| AMBER THOMPSON (o.b.o. L.R.D.), | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) Case No. 3:22-cv-5078-NKL |
| KILOLO KIJAKAZI; Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant | ) ) |

Plaintiff Amber Thompson, on behalf of her minor child L.R.D., seeks review of the denial by the Commissioner of the Social Security Administration of her application for Supplemental Security Income ("SSI"). Plaintiff[1] argues reversal is required because the Commissioner improperly evaluated the limitations caused by L.R.D.'s knee impairment, leading to an erroneous conclusion that L.R.D. had a "less than marked" limitation to her ability to move about and manipulate objects. For the reasons discussed in more detail below, the Commissioner's decision is AFFIRMED.

I. BACKGROUND

A. The ALJ's Decision

As relevant to this appeal, L.R.D. has chronic pain in her right knee caused by osteochondritis dissecans. Plaintiff claims that, as a result, L.R.D. became disabled on June 26,

---

[1] The Court will refer to Ms. Thompson as "Plaintiff" in this Order.

2017.[2] Because L.R.D. is a minor, the Commissioner uses a three-step sequential evaluation process, rather than the traditional process used for adults. 20 C.F.R. § 416.924(a). At the first step, the Commissioner must determine whether the child has engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If so, the child is not disabled; if not, the evaluation continues. The second step asks whether the child has an impairment, or combination of impairments, that is "severe." 20 C.F.R. § 416.924(c). If not, disability is denied; if so, the Commissioner moves to the third step. At step three, the Commissioner determines whether the child has any impairment that meets, medically equals, or functionally equals a listed impairment. 20 C.F.R. § 416.924(d). Functional equivalence is unique to the childhood SSI analysis; it is not part of the adult sequential evaluation, which instead includes the "residual functional capacity" finding and consequent determination of a claimant's ability to work.

To determine whether an impairment is "functionally equivalent" to a disability listing, the Commissioner considers six "domains" of functioning. The Commissioner must find that a claimant has a "marked" limitation in two of the six domains of functioning, or an extreme limitation in one, to find functional equivalence. A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). Here, the ALJ found that L.R.D. had only one marked limitation. Plaintiff argues that the ALJ should have found L.R.D. had a second, in the "moving about and manipulating objects" domain. *See* Doc. 10, at 6–17.[3]

---

[2] The alleged onset date was subsequently amended to December 23, 2019. Tr. 55.

[3] The moving about and manipulating objects domain requires the Commissioner to "consider how [a claimant] moves [her] body from one place to another and how [she] move[s] and manipulate[s] things." 20 C.F.R. § 416.926a(j). It includes evaluating a claimant's ability to "[s]everal different kinds of actions," including rising from a sitting to a standing position, balancing, bending,

2

Case 3:22-cv-05078-NKL   Document 13   Filed 06/20/23   Page 2 of 14

In concluding that L.R.D. had a less than marked limitation in the moving about and manipulating objects domain, the ALJ agreed that L.R.D.'s knee pain could reasonably be expected to stem from her osteochondritis dissecans but discounted the degree to which L.R.D.'s knee pain limited her ability to move. Tr. 30. Specifically, the ALJ pointed to the fact that L.R.D.'s teachers reported that she had no limitation in her ability to move and noted that she shows normal gross motor skills. The ALJ also pointed to various medical providers' noting "essentially normal" findings when examining L.R.D. Tr. 31. The ALJ also relied on the fact that there was no evidence to support a finding that L.R.D. had a medical need for a wheelchair or other assistive device, and that medical records indicated that L.R.D.'s knee condition was improving with physical therapy. That said, as the ALJ noted, the pain would return when L.R.D. used her knee—including when she walked. Tr. 31

### B. Medical Records

On May 13, 2019, L.R.D. reported bilateral knee pain to her doctors. She had mild tenderness over the patella, and her doctors ordered an x-ray. The x-ray of L.R.D.'s right knee performed shortly thereafter showed osteochondritis dissecans. As a result, L.R.D. was prescribed physical therapy; L.R.D. attended 19 physical therapy sessions between July 2019 and October 2019. She was once again referred to physical therapy in March 2020; however, due to the COVID-19 pandemic, sessions could not resume until July 22, 2020.

L.R.D.'s knee pain continued, despite improvement with physical therapy. She told her doctors that her knee pain was worse when she exerted herself. Tr. 466. As a result, one doctor told L.R.D. "not to stress the right knee by extensive exertion." Tr. 466. Several doctors noted

---

kneeling, crouching, walking, crawling, running, or negotiating terrain such as curbs, steps, or hills. 20 C.F.R. § 416.926a(j)(1)(i)

some tenderness and discomfort in the right knee when L.R.D. put weight on it. Others noted no or only minimal pain or discomfort in L.R.D.'s knee. In April 2021, when L.R.D. again complained of knee pain, her doctor recommended "a course of nonweightbearing to see" if L.R.D.'s osteochondritis dissecans would heal on its own. Tr. 753. While keeping weight off her knee did alleviate her pain, and L.R.D. was anxious to get rid of her crutches, when she began putting weight on her knee again, the pain returned. Tr. 749; Tr. 747–48. L.R.D. was once again placed on crutches while doctors performed an MRI to determine whether surgery was necessary. Tr. 748. Plaintiff testified that L.R.D. was nonweightbearing full time starting in April 2021, and she relied on crutches or a wheelchair to get around. Tr. 59–61.

In August 2021, L.R.D. underwent surgery. The same day, L.R.D.'s doctors completed paperwork to permit L.R.D. to obtain a handicap placard, valid for only 90 days. Tr. 322. One of L.R.D.'s doctors certified that she could not walk 50 feet without stopping to rest because of her knee condition because of a disabling condition. Following her surgery, L.R.D. returned to physical therapy on August 10, 2021, where she reported pain, weakness, decreased range of motion, impaired mobility, impaired ambulation, impaired balance/proprioception, and impaired core stabilization and postural control. Tr. 1009. That said, she rated her pain when she presented as a 0 out of 10, but noted that it could be as bad as an 8 out of 10. Tr. 1007–08.

## II. STANDARD

The Court must affirm the Commissioner's denial of social security benefits so long as "there was no legal error" and "the findings of fact are supported by substantial evidence on the record as a whole." *Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016) (internal citation omitted). "Substantial evidence is 'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the ALJ's conclusion.'" *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)). The Court must consider

4

evidence that both supports and detracts from the ALJ's decision. *Id.* But "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence [also] exists in the record that would have supported a contrary outcome, or because [the Court] would have decided the case differently." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (quotation marks and citation omitted). Ultimately, the Court must "defer heavily to the findings and conclusions of the Social Security Administration." *Michel v. Colvin*, 640 F. App'x 585, 592 (8th Cir. 2016) (quotation marks and citations omitted).

### III. DISCUSSION

Plaintiff makes several arguments to suggest that the ALJ erred in concluding L.R.D. had a less than marked limitation in her ability to move about and manipulate objects. The Court must therefore determine whether substantial evidence supports the ALJ's determination that L.R.D.'s osteochondritis dissecans does not "interfere[] seriously with [her] ability to independently initiate, sustain, or complete activities" in the domain of movement and manipulating objects. 20 C.F.R. § 416.926a(e)(2)(i). Before doing so, however, the Court will address Plaintiff's challenges to the way the ALJ considered the opinion evidence in his decision.

#### A. Whether the ALJ's Reliance on Consultative Examiners was Error

When evaluating the movement and manipulating objects domain, the ALJ found the opinions of two consultative examiners persuasive, and ultimately adopted the same limitation as the examiners. Tr. 32. Plaintiff argues this was error because the examiners' opinions were rendered before some of the evidence related to L.R.D.'s knee impairment was available; specifically, additional imaging studies, records reflecting L.R.D.'s attempts to go nonweightbearing to get her knee to heal, L.R.D.'s knee surgery, the physician's statement supporting L.R.D.'s post-surgery disability placard, and records from L.R.D.'s post-surgery physical therapy all became part of the record after the August and December 2020 consultative

5

examiner reports. Tr. 106–107, 116–17 (examiner reports); Tr. 748, 753 (L.R.D.'s reliance on crutches and periods of nonweightbearing); Tr. 322, 980, 1006–09 (post-surgery evidence).

An "ALJ does not automatically err by crediting a medical opinion that was rendered without the benefit of a claimant's full medical record." *Walker v. Kijakazi*, No. 6:21-CV-3235-NKL, 2022 WL 3036639, at *6 (W.D. Mo. Aug. 1, 2022). If the ALJ "conducts an independent review of the evidence and takes into account portions of the record the consultant had not considered," the ALJ is allowed to rely on opinions that predate a complete record. *Id.* (citing *Kuikka v. Berryhill*, No. 17-cv-374, 2018 WL 1342482, at *10 (D. Minn. Mar. 15, 2018). For three reasons, the ALJ's reliance on the consultative examiners was not reversible error. First, the ALJ concluded, and the Court agrees, that the examiners' opinions were consistent with the record, which includes the later-submitted evidence. Second, the ALJ independently analyzed most of the evidence that was gathered after the examiners rendered their opinions. Finally, these later-submitted records do not undermine, or fundamentally differ from, the medical evidence available to the consultative examiners such that the ALJ could not consider their impact without an additional consultative examination.[4]

For example, Plaintiff notes that L.R.D. had additional imaging studies after the examiners' opinions were rendered. But the ALJ discusses that evidence, and he noted that L.R.D.'s condition was stable across all imaging studies, including those available to the consultative examiners. Tr. 30–32. Plaintiff does not explain how the additional imaging studies demonstrate L.R.D.'s condition got worse or otherwise reflect "new" medical findings that would undermine the examiners' opinions or the ALJ's reliance on them. Instead, Plaintiff just notes that the studies

---

[4] While Plaintiff argues that the later-submitted evidence demonstrates that L.R.D.'s condition was worsening, the Court disagrees; the medical records do not demonstrate L.R.D.'s knee injury at any point got worse.

took place after the examiners' reports were rendered, which is not enough. Plaintiff further argues that the records demonstrating L.R.D.'s reliance on crutches or a wheelchair and L.R.D.'s surgery were not available to the consultative examiners. But the ALJ discussed both L.R.D.'s attempts to keep weight off her knee and her surgery. Tr. 32. As the Court will soon discuss, these efforts do not reflect a worsening condition or that L.R.D. required the use of an assistive device; they reflect attempts to treat L.R.D.'s underlying knee impairment. Here again, while these records reflect additional treatment, given the ALJ's explicit discussion and interpretation of these records, it was not error to rely on the earlier-submitted consultative examiner opinions. The same is true regarding L.R.D.'s disability placard and the records from post-surgery physical therapy. While this evidence was not available to the consultative examiners, they do not undermine their conclusions or otherwise indicate that an additional consultative examination should have been ordered.

At bottom, there is no evidence that the ALJ improperly ignored any evidence submitted after the consultative examiners rendered their opinions, nor is there any indication that the later-filed medical records demonstrated substantial changes in L.R.D.'s functioning or condition, such that the ALJ could not properly interpret the records without the help of an additional medical expert. The consultative examiners were aware of L.R.D.'s diagnosis of osteochondritis dissecans, and specifically knew that it sometimes caused L.R.D. pain. The consultative examiners were also aware of the functional limitations that L.R.D. claimed, such as an inability to run or jump, and that L.R.D. claimed that she needed a wheelchair to get around. The examiners simply concluded that the limitations claimed by L.R.D. were not entirely consistent with the medical evidence.

While L.R.D.'s treatment continued, the later medical records do not undermine the consultative examiners original conclusions such that ALJ could not properly consider them persuasive.[5]

### B. Whether the ALJ Should Have Addressed Dr. Seagrave's Physician Statement as a Medical Opinion

After L.R.D. had surgery to address her knee pain, her doctor, Dr. Seagrave, submitted a statement supporting L.R.D.'s application for a temporary disability placard for her car. Tr. 322. In it, Dr. Seagrave certified that, due to a temporary disability, L.R.D. "cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." Tr. 322. The document was dated 8/5/2021 and it was valid for 90 days, until 11/3/2021. There is no evidence that Dr. Seagrave submitted an additional statement after the first one expired, nor is there any indication that Dr. Seagrave had previously submitted such a statement suggesting that L.R.D.'s knee pain constituted a disability or limited her ability to walk prior to her surgery. The ALJ did not discuss this evidence at all.

Plaintiff argues that the ALJ should have considered Dr. Seagrave's statement a medical opinion under the Commissioner's regulations. A medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions[.]" 20 C.F.R. § 416.913(a)(2). According to Plaintiff, because the movement and manipulating objects domain includes the ability to walk, Dr. Seagrave's opinion that Plaintiff could not walk 50 feet without stopping for a break constitutes a medical opinion. Doc. 10, at 13. If Dr. Seagrave's statement is a medical opinion, as defined by the Commissioner's regulations, the ALJ would have been required to discuss its persuasiveness,

---

[5] Plaintiff also notes that a document submitted by L.R.D.'s doctor to allow her to obtain a temporary disability placard following her surgery and post-surgery physical therapy are among the evidence submitted after the consultative examiners issued their opinions. The Court will address this evidence separately.

including by explicitly evaluating the statement's supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). Not doing so, says Plaintiff, was legal error requiring remand. Doc. 10, at 15.

The Commissioner responds that Dr. Seagrave's statement is not a medical opinion, but instead is merely evidence that supported a decision made by another government agency—to give L.R.D. a disability placard under Missouri law. If Dr. Seagrave's statement is evidence, it is governed by a different section of the Commissioner's regulations, and the ALJ was not required to explicitly analyze it. 20 C.F.R. § 416.904 (the Commissioner "will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence.").

Dr. Seagrave's statement is not a medical opinion. A medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions[.]" 20 C.F.R. § 416.913(a)(2). Dr. Seagrave did not opine how far L.R.D. can walk, or even link her inability to walk to a specific impairment. Instead, Dr. Seagrave simply certified that L.R.D. was temporarily disabled under Missouri law because she could not walk fifty feet without resting due to some condition. Plaintiff cites no case that has considered such a statement a medical opinion under the relevant regulations, and the Court is aware of none. Furthermore, because Dr. Seagrave did not submit his statement until after L.R.D.'s surgery and because it is limited to only 90 days, nothing suggests that the statement addresses L.R.D.'s underlying impairment—her osteochondritis dissecans—at all. For that reason, while the ALJ was required to consider the statement as evidence pursuant to 20 C.F.R. § 416.904, there was no need to treat Dr. Seagrave's statement as a medical opinion. And because there is no indication that the ALJ ignored the evidence, it was not error that the ALJ did not discuss the statement. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to

9

develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." (internal citations omitted)).[6]

### C. Whether Substantial Evidence Supported the ALJ's Analysis of the Evidence

The Parties disagree whether substantial evidence in the record supports a determination that L.R.D. has a less than marked impairment in her ability to move and manipulate objects. The Court's role when reviewing an ALJ's evaluation of the evidence is narrow; the Court looks only for legal error and to determine whether substantial evidence in the record as a whole supports the ALJ's determination. *Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016) (internal citation omitted). It does not matter whether substantial evidence also supports the outcome Plaintiff seeks, and it does not matter whether the Court would have decided the case differently than the ALJ. *Andrews*, 791 F.3d at 928. All it takes is enough evidence that "a reasonable mind would find it adequate to support the ALJ's conclusion." *Milam*, 794 F.3d at 983 (quoting *Jones*, 619 F.3d at 968). Here, there is such evidence.[7]

---

[6] The Court agrees with the Commissioner that even if the ALJ should have evaluated Dr. Seagrave's statement as an opinion, not doing so was harmless error. Dr. Seagrave's statement does not establish any specific limitation to L.R.D.'s ability to walk. The statement is not supported by any narrative discussion or citation to any medical records; nor does it link L.R.D.'s inability to walk 50 feet to any specific impairment. Dr. Seagrave's statement—submitted to the State of Missouri for a different (and temporary) disability determination—does not support Plaintiff's argument that she has a marked impairment in her ability to move and manipulate objects.

[7] The Parties dispute whether the regulations require that a claimant's functional impairment must last more than 12 months. Plaintiff appears to argue that only a claimant's *impairment*—here L.R.D.'s knee lesion—must last or be expected to last 12 months to establish a disability. According to Plaintiff, the impact the impairment has on L.R.D.'s functioning is not subject to the same requirement. The Commissioner disagrees, arguing that L.R.D.'s marked limitation must last or be expected to last 12 months, too. Said differently, the Commissioner appears to argue that even if L.R.D.'s condition functionally equaled a listing at the time of the ALJ's decision, it is not enough if that equivalency had not lasted 12 months at the time of the hearing. The Court

To begin, a reasonable mind could conclude that, based on L.R.D.'s medical records, she experienced a less than marked limitation on her ability to move and manipulate objects. To find a marked limitation, the ALJ had to conclude that L.R.D.'s knee impairment "interfere[d] *seriously* with [L.R.D.'s] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i) (emphasis added). While L.R.D.'s medical records do regularly reflect that she suffered from some knee pain, the records can reasonably be read as showing that the pain had limited functional impact on her ability to move. For example, in May 2019, L.R.D. presented with right knee pain, but she was not limping and had a normal range of motion. Tr. 387. In July 2019, L.R.D. was able to pass 4 of 7 elements of her functional assessment, which included running, jumping, single leg stand, and hopping. Tr. 526. While she failed her squat test, it was only because her heels lifted, and her therapist was "able to correct [L.R.D.'s failed lunge test] w/ cuing." *Id*. There is no evidence attributing the failed tests to her knee pain. The only indication of any impairment stemming from L.R.D.'s knee injury was minor pain occurring after her run test. *Id*. Ultimately, the medical records note that "very little pain" was elicited during the exam. *Id*.

Furthermore, in February 2020, L.R.D. could "comfortably transition from sitting to standing;" was "ambulatory without signs of pain or distress;" and demonstrated the ability to walk on her toes or heels without difficulty [and] without a limp." Tr. 444–45. In October 2020, L.R.D. was once again examined and found to have a full range of motion despite some knee pain. *See* Tr. 757. In March 2020, L.R.D. was evaluated by her school for special education services. That evaluation indicated that L.R.D.'s teachers and parents alike reported that L.R.D.'s gross motor

---

need not resolve this dispute, as, even if Plaintiff were correct, she would still not succeed on this appeal.

skills are within normal age-appropriate limits. Tr. 217.[8] In January 2021, L.R.D.'s doctors noted that while she had right-knee tenderness and some discomfort in her right leg, she had a normal range of motion, coordination, and gait, with no weakness. Tr. 737.

L.R.D. was also able to complete numerous physical therapy sessions, which required her to put weight on and use her knee. *E.g.*, Tr. 627; Tr. 630. For example, after one 45-minute physical therapy session in September 2020, L.R.D.'s pain was at a 2. Tr. 639. And despite reporting that she experiences leg pain when she sits or stands too long, even during physical therapy sessions she typically only rated her pain level a 3 or 4 out of 10. *See* Tr. 629; Tr. 639; Tr. 641 (9/21/2020); Tr. 645–46 (9/24/2020). Sometimes, especially as physical therapy progressed, L.R.D.'s pain was nonexistent, or as low as a 2 both starting and finishing her sessions. Tr. 651; Tr. 654 (10/5/2020); Tr. 660–61 (10/15/2020); Tr. 778–79 (10/19/2020).

Plaintiff argues that L.R.D.'s knee condition was worsening, and so these records should be less persuasive. But the medical records don't support that L.R.D.' knee condition was getting worse. Plaintiff at least once reported to medical professionals that it was. Tr. 466 (August 2020). But L.R.D.'s doctors noted that her lesion itself was stable. *E.g.*, Tr. 755; Tr. 762–64. Plaintiff points to the decision to put L.R.D. on crutches as a sign that her condition got worse. But, after reviewing the records, L.R.D.'s doctors simply wanted to give L.R.D.'s lesion a chance to heal without surgery. Tr. 753.[9] After being nonweightbearing for six weeks, L.R.D.'s pain

---

[8] Plaintiff argues that relying on this report is error, given it predates the worsening of L.R.D.'s condition. Plaintiff cites no evidence that L.R.D.'s condition actually got worse. Accordingly, the ALJ was within his authority to rely in part on the evaluation by L.R.D.'s teachers and parents of her gross motor functions.

[9] Plaintiff argues that the ALJ erred in determining that L.R.D. had no medical need for crutches or a wheelchair. The Court disagrees. As discussed, the record indicates that L.R.D.'s doctors put her on crutches to keep weight off her knee to see if her lesion would heal, not because her condition required the crutches to move around. While L.R.D. continued to use her crutches and

disappeared. Tr. 750. While L.R.D.'s pain came *back* after she stopped using her crutches, Tr. 992, there is no evidence that the pain or her ability to function got worse. Indeed, after L.R.D. reported her pain returned, L.R.D.'s doctor noted the pain was mild and L.R.D. had a full range of motion. Tr. 747 (6/8/2021). Finally, when L.R.D. reported to physical therapy after her knee surgery, she reported her current knee pain at a 0, though she stated it could get as bad as an 8. Tr. 1011.

Plaintiff argues that the ALJ selectively read L.R.D.'s medical records. Had the ALJ done so, it could be grounds for reversal. *See Walker*, 2022 WL 3036639, at *7. But here, after reviewing the medical records, the Court has found no evidence the ALJ selectively read them or only considered the portions of the records that supported his decision. Plaintiff cites to various medical records that document L.R.D.'s knee pain. Doc. 10, at 10–11. But, once again, those records all reflect only mild tenderness and pain and *some* impact on L.R.D.'s ability to move; they do not unequivocally demonstrate that the pain "seriously" impacted her ability to move around. While those records might support a decision to find a marked limitation, they do not foreclose the ALJ's opposite conclusion. As discussed, nor is there any indication that the ALJ ignored Dr. Seagrave's Physician Statement supporting L.R.D.'s disability placard after her surgery. *See infra* n.8. Considering the whole record, the ALJ's conclusion—that, while L.R.D.

---

wheelchair, substantial evidence supports the ALJ's conclusion that doing so was not medically necessary. When specifying that a temporary disability placard was necessary for L.R.D., her doctors had the opportunity to check a box indicating that L.R.D. "cannot ambulate or walk without the use of, or assistance from, a brace, cane, crutch, another person, prosthetic device, wheelchair, or other assistive device," but they did not do so. *See* Tr. 322. Instead, her doctors indicated that the placard was necessary only because L.R.D, could not walk 50 feet without stopping to rest due to a severe and disabling condition.

certainly suffered from chronic pain in her right knee, it did not cause a marked limitation in her ability to move—is supported by substantial evidence.[10]

IV. CONCLUSION

The Commissioner's determination that L.R.D. is not disabled is AFFIRMED.

SO ORDERED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: 6/20/2023
Jefferson City, Missouri

---

[10] The ALJ also credited a report from a teacher, completed on June 30, 2021, to support his decision to find a less than marked limitation to L.R.D.'s ability to move and manipulate objects. Tr. 31. Plaintiff argues this was error because the ALJ credited the opinion in one portion of the opinion but discounted it in another because it was "generally unpersuasive as it [is] unsupported by explanation, other than 'reasons unknown' or 'reasons unclear.'" Tr. 33. Furthermore, Plaintiff argues that this opinion was provided by a teacher who interacted with L.R.D. only over Zoom, so it makes sense that he was not "aware" of any limitation. Doc. 11 (quoting Tr. 320). Even assuming it was error to rely on this evidence, it was harmless. Even without that report, as discussed throughout this Order, substantial evidence supports the ALJ's conclusion.